May it please the Court, opposing counsel David Barr for the plaintiff appellant in this matter. I would like to reserve half my time for rebuttal. You may do so, counsel. Just watch the clock. This matter really involves a situation of perceptions, it strikes me. Perceptions about what degree of expectation the Forest Service firefighters would reasonably have when they're involved with a fire fatality as far as their identity, privacy of that identity or its public availability. What kind of stigma might reasonably be perceived to attach to disclosure of that identity? And what, if any, public benefit could reasonably be expected to accrue from disclosure of the identity of those firefighters? We did get some names, so you're talking about the additional 22 names. Well, we got one name, Mr. Hackett, who was the incident commander. His identity was originally redacted along with the rest, but pursuant to a plea agreement for the manslaughter charge, one of the provisions of that agreement was that his name be disclosed. And you got the entire 80-page-plus document, except for the redacted names here and there and a couple of places. Exactly, Your Honor, exactly. And, of course, the Forest Service's perspective is that's enough. You can understand what's going on with our review, what's going on on the fire by that information. You don't really need to know who was there. Well, what's our standard here? Is it, quote, unwarranted invasion of personal privacy, unquote? Is that the underlying one? It's clearly unwarranted, and it's only invoked if it is clear that that invasion would happen. And I'm glad you asked that, because it's a distinction with a number of the cases that have been cited by defendant, unsurprisingly, because there's some commonality in the analysis that relate to FOIA's Exemption 7C for privacy of individuals who are named in law enforcement records. In that case, it's a much more relaxed standard as far as the ability of the agency to withhold. In that context, it's just the standard is if it could reasonably be expected that disclosure might cause an invasion of privacy. It doesn't have the would cause, and it doesn't have the clearly unwarranted language. Do we know how many of the 22 names of those people were disciplined? My understanding is that six were disciplined. Five were listed in the report. One of those five has been listed or has been disclosed, which is Incident Commander Hackett. So we have four names that remain that apparently have been subject to some form of disciplinary action by the agency, and the others were cooperating witnesses, which supposedly whom supposedly had no amount of culpability. Like cooperating witnesses, does that equate to snitches? No. It equates to people who were present at the situation and either volunteered or requested to provide information about what was happening. I think it's appropriate to recognize that the agency is at least ostensibly, and I think in many cases, in fact, attempting in a good faith process to review the mistakes that do occur and to remedy those mistakes and prevent them from occurring in the future through this investigative process. However, one of the problems that will, the problem that we've noted in our briefing, that Congress has noted and that others have noted, such as OSHA, is this culture, the culture, the can-do culture. We will fight the fire with all the means available at our disposal, and we will save homes, we will draw fire lines in the woods, and we will prevent the spread of the fire in a very, very aggressive manner. And this culture that OSHA identified repeatedly, as well as the Inspector General's Office when it reviewed the accident, this culture is at the root of the 14 dead at the Storm King fire in Colorado, the four dead in the 30-mile fire in Washington,  What is the marginal utility of receiving the names of these 22 individuals in terms of the public interest in understanding the culture you've described and understanding the events that occurred and changing public policy, all the things that your client might be interested in doing? Well, there's two answers to that, Your Honor. One is in the very immediate sense that disclosure of the names in the context of the report, not in isolation as defendant's briefing suggests, but in the context of the report will very concretely illuminate who was doing what, where, and when, and what their role was in the safety or the lack of safety of the individuals fighting the fire. All right. But the report's pretty detailed. So, you know, why are the names going to help the public understand what went wrong? It would be very central to the FOIA's purpose of allowing public oversight of agency operations if the incident commander on the Kramer fire was also the incident commander at the 30-mile fire and was also the incident commander at the Storm King fire. But you have the commander's name, don't you? Well, we do because of a plea agreement. Say we have the fire management officer, the FMO, whose name is redacted, the same proposition would hold true there. If these people are reappearing in fire after fire, the knowledge, the public awareness of that goes right to the heart of FOIA's core purpose. It makes it seem much more like an employment file the way you described it, though, because what you're sort of saying is, well, if the same bad apple is responsible, maybe the public ought to know that the wrong people are employed in positions of authority. Well, it's either – that's one way of looking at it. Another way of saying what is the agency doing as far as its management and its oversight that it puts these people in these places? Or to take a – to invert that proposition, what are people doing that is right? What are people doing to prevent burnovers and accidents and fatalities? What benefit would accrue if we see, hey, in the Esperanza fire in California where there were five deaths last July, there was another situation where a burnover was extremely – was imminent, but the incident commander at that moment took steps to avoid that tragedy. But you know that without mentioning the names. We don't know. I mean, it describes what they did and what happened. You just don't know who they are, right? Well, that's correct, but – So that kind of comes back to why isn't that an employment issue? I mean, you can look at something, whether it's right or wrong, by virtue of the actions and judge the actions, and it doesn't really matter who the people are. Well, it does matter who the people are if the same people are involved in situation after situation or if the same people are involved to avoid – avoiding situation after situation. And we – the government, we are, you know, of the people, for the people, and by the people. The agency is not just a bureaucracy that is not populated by human beings. Well, so if you had the names, then what you would do is you would call for the agency to fire that person? Would that be what the information would – if you had the name? Or that that – or that we would see that the agency is assigning people repeatedly in positions that they may not be competent to deal with. There were – there were concerns that are expressed during this fire by the aviation officer that the incident commander was in over his head, and those concerns were not – were not attended to. You know, what is it about the agency's management that allows those sorts of things to occur? Without knowing the names, it makes it very – well, it makes it impossible for the public to understand. Certainly, the agency – I don't – I just don't buy that. I mean, you can read that report, and you know exactly what happened, and you know what bad practices occurred and what was responsible. Well, I just don't understand what tiny little bit of extra help it is other than castigating particular individuals in their employment role. Well, Your Honor, certainly the names have some utility because the agency wrote a report that had those names. If the agency didn't feel that the names had some oversight and an analytical benefit, they would have created a report with no names. They would have just used the job designations. So certainly the agency itself believes that there's a benefit to knowing who's doing what and where. And it is essentially irrigating for itself the benefits that accrue from that knowledge and preventing the public from having a similar knowledge, and that's what FOIA is intended to prevent. Counsel, can you help me with perhaps a comparison to the Favish case? And I mention Favish because it was one of the rare instances in which an opinion in which I participated was reversed by the Supreme Court. And I held that these photographs should be released. Now, of course, that was under the 7c exemption. But nevertheless, the Court has taken a rather broad approach in this case, Washington Post and some others, which suggest that the personal privacy interests of the individuals are to be given very, very strong attention and concern. And in this particular case, where I felt, looking at the language, that those photographs should be released, the Supreme Court reversed it and said no, that the personal privacy interests of the family in that particular case were paramount. Help me sort this out. How would you look at that case as compared to what we have here? Well, with all due respect, I would challenge your characterization that the Court has taken a uniformly embrace, a strong embrace of the privacy interests. It's a continuum. The courts have held that when there is a de minimis privacy interest, it's mandatory that disclosure would attach. However, where there is a demonstrated strong privacy interest, such as with Favish or with the Shuttle disaster, the National Security Archives v. NASA case, or with the Washington Post case, or with Ray, with the Haitians, those have to be balanced against the public interest. It's a balancing test to say in Favish that the photographs of a person who killed themselves and the very graphic images that would be released by the Supreme Court circulated to the media would be very traumatic if released to the public. The release would be very traumatic to the family members. And when balancing, the Court didn't stop there. The Supreme Court said, and balanced against the public benefit from seeing what the government is up to, it tips in favor of withholding that information. But the release in this particular case of the names of people presumably who live in the fairly close community might potentially expose them to harassment and other kinds of activity which would be beyond what any of them should expect in terms of the way they do business. Well, Your Honor, with all due respect, I think there's a certain element of speculation in there. And in fact, as far as the 18 individuals who are the cooperating witness, I think that disclosure would tend to exonerate them. If there's a report about an incident where somebody died, and we know that some people were killed. Have they joined you in your suit to reveal their names? No, but they haven't appeared on the behalf of the government asserting their privacy interests either. They haven't submitted any affidavits or declarations saying I'm listed in this report and I don't want my name circulated. Well, they don't have to do that. Congress has done it for them if this applies to them. But my question is what would you do with these names? What would you do that you haven't already done? They would provide a source of information both for the oversight of this fire and for the monitoring and oversight of agency actions in future fires. That's a generality. So you would just reread the report and understand it better? Is that what you would do? We would compare it. Would you contact employees? I don't believe that FC has any intent to contact employees. I would imagine, my understanding is that the benefit of the information Would they then get named in lawsuits? Pardon me? Would they, would that provide discovery for lawsuits? Their names would be added to lawsuits? I don't believe that. Well, I don't know the answer to that, Your Honor. I do, I can say with certainty that it would provide no additional litigation advantage to the practice that existed for 50 years prior to this report when all names were routinely listed in the accident investigation reports. And I'm not aware of a plug gate of lawsuits that opened as a result of the availability of those names. Would people write letters suggesting that people should be fired or disciplined? I don't know, Your Honor. That would be speculation. I would imagine that for the 18 individuals who just provided their witness statements and when the report was released with their names, the content and the context would illustrate that they had no culpability. I would imagine that there would be a benefit to them accruing. Would they be harassed at work because other people knew that they gave information against them? Well, again, for 50 years the agency routinely published the names of individuals in these accident reports. This is the first instance in five decades where they attempted, where they redacted this information. And the government has not provided a history in the record of problems related to harassment or other workplace or non-workplace adverse impacts that were associated with that. The record is entirely devoid of any evidence in that regard. Counsel, you're down to about five minutes. I'm seeing that, Your Honor. I appreciate that. Through your questions, I've addressed a number of matters. I would like to briefly address, and I recognize I'm swimming against a strong current in this regard, the argument that this document is not even properly considered a document under Exemption 6. We've briefed it fairly thoroughly, so I won't spend much time on it. But I want to underscore that this is a report on an incident. It is not a detailed report on an individual. And to assert the government's, to apply the government's analysis would essentially say that any document within the government's possession that lists an individual that names a person would be covered by Exemption 6. And then you engage in the balancing process. We are asserting that we don't even get to the balancing because this is a public report about a public event about an incident that happens to name individuals. And for that reason, it doesn't even get, even within the broad standard articulated in the Washington Post case, it doesn't surmount the threshold for Exemption 6 inclusion. And with that, I will cease talking. Thank you, Your Honors. Thank you, counsel. We'll hear from the government. May it please the Court, my name is Steve Frank on behalf of the Appellee. My colleague, Mr. Barr, is correct that this case arose out of very tragic circumstances. And he's also correct that the American public has a legitimate interest in knowing what went wrong here and making sure that its government takes steps to ensure that it doesn't happen again. The problem with his argument, as I think the Court has detected, is that that has already happened. There have been four reports, not just this report, but four separate reports of these fires, extensive reports by OSHA, the U.S. Attorney's Office, the Forest Service, and one other report that's in our brief. And all of these reports are in the record excerpts. These reports detail at length the failure of the Forest Service in this instance and what the Forest Service needs to do to correct it. Do they include names that are also in this document? The OSHA report does include names that have been redacted out of this document. But the important point is that what is important about this case is that it's not just the names per se that are important. It's the names in the context of this document, what people were doing, what people were saying. Well, I'd like to pursue that because that's one of the things that troubles me about your position. I think all but five of the names, as I understand it, are already in the public domain through the OSHA and the OIG report. And once something passes into the public domain, it no longer is clearly private or in the terms of the exemption in which you're reminding. And at least as to those individuals, I really don't understand how you can make a claim that those are any longer private or protected by a privacy interest. And I guess that's part one of my question. Part two is it's quite clear that another agency of the government, namely OSHA, has taken a completely different view of whether Exemption 6 applies and whether it protects this information. And what, if anything, do we do in terms of deferring to that interpretation? Directing myself to your second question first, I assume, Your Honor, is talking about the OSHA report that disclosed something. I don't take that as OSHA taking a different position than the Forest Service on the issue, because this report was not before OSHA when it issued its report. What is before this Court is a determination as to whether this particular report written by the Forest Service is subject to Exemption 6. OSHA in no way made that determination. And that ---- It did not believe that the identities of individuals, their names, was a protected privacy interest. And, Your Honor, that would be a different question. If I was up here and you were to ask me, were the names of these people per se, that X was the incident commander, that Y was the deputy commander or what have you, per se identifying them, would that be protected? That would be an entirely different question. And the answer to that question might be no. But what is important is that you have a report which details what people were doing, what they were saying. And then ---- So you're saying because OSHA threw them under the bus and didn't try to protect them, that that doesn't affect your position whatsoever? I'm sorry. I missed the first part. Well, OSHA essentially didn't try to protect those people, right? The OSHA report and what OSHA did, with all due respect, Your Honor, really has nothing to do with this because OSHA made no determination on whether these individuals have a privacy interest in not having their names disclosed in the context of this report. That's a critical point that I want to make. Was the OSHA ---- And if I'm not making that, I would like to explain more about it. Was the OSHA report released pursuant to a FOIA request or was it just released to the public without any ---- Yes. OSHA was doing its job. It was OSHA was doing its job and was investigating this report and issued a report. I would like to point out to the Court ---- In other words, there was no FOIA request. Correct. So the information passed into the public domain, which was the beginning part of my question. If information is already in the public domain, then it doesn't become protected just because it's put in a file. Two points. I don't want to beat a dead horse, but this is the critical point from the government's point of view, is that the information is not in the public domain in the context in which plaintiff requests it under his FOIA request. The information of who was present, who was working for the Forest Service, that might be in the public domain. The information of ---- let me give a very specific and graphic example, all right, that I think answers the question. The information of who were the two people who discovered the bodies of these firefighters and put them in body bags and took them down the mountain, that information which is redacted in this report has not been made available by OSHA. That's the kind of information, precisely the kind of information, which we are trying to protect. And that is precisely the kind of information that will tell us nothing, which is the only test under FOIA, about what the government was up to, whether it was X or Y. That might be a unique example in this report, though, because other things had to do with how people did their jobs, not so much sort of the personal unhappiness of dealing with the aftermath. But, you know, it seems to me that the redaction was sort of across the board and not limited to those things that could be traumatic and not there specifically on how people were doing their jobs. People, most of whom were low-level government employees who were just going about doing their job, there was no accusation of any culpability on their part, have a privacy interest in not being associated with a tragic event like this and not be subjected to the kind of invasions of privacy, which Your Honor has noted the Supreme Court has recognized. You believe that public employees have a privacy interest in their names being withheld in terms of how they were doing their jobs? Yes. The cases are clear that although public employees may have a diminished privacy interest, they still have a public interest. And I would like to get back. I don't think I ever answered Your Honor's initial question to me about it being out in the public domain. I would refer the Court to page 57 of our brief, which points out cases such as Reporters' Committee, Sherman v. Department of the Army, and Mobile Oil Corporation, which Your Honor did get correct, or at least it was not reversed, which says that the public employees have a privacy interest in their names being withheld in terms of how they were doing their jobs. And I would like to get back. I don't think I ever answered Your Honor's initial question to me about it being out in the public domain. I would refer the Court to page 57 of our brief, which points out cases such as Reporters' Committee, Sherman v. Department of the Army, and Mobile Oil Corporation, which says that the public employees have a privacy interest in their names being withheld in terms of how they were doing their jobs. And I would refer the Court to page 57 of our brief, which points out cases such as Reporters' Committee, Sherman v. Department of the Army, and Mobile Oil Corporation, which says that the public employees have a privacy interest in their names being withheld in terms of how they were doing their jobs. And I would refer the Court to page 57 of our brief, which points out cases such as Reporters' Committee, Sherman v. Department of the Army, and Mobile Oil Corporation, which says that the public employees have a privacy interest in their names being withheld in terms of how they were doing their jobs. And I would refer the Court to page 57 of our brief, which points out cases such as Reporters' Committee, Sherman v. Department of the Army, and Mobile Oil Corporation, which says that the public employees have a privacy interest in their names being withheld in terms of how they were doing their jobs. Now, Hibble case, a search case where you have to give out your name, but the point here, and again, the critical point about FOIA is it's all about context. There is no privacy interest, I don't think, in just your name, but it's in the context and it's a balancing test. The government is not up here making any kind of an absolute argument. This is a balancing test. And what we have is we have a privacy interest. And I think that we're all in agreement that there is some kind of privacy interest involved here. The Court asked questions that were very concerned about whether these people might be stigmatized. In fact, I think that, without meaning to disparage my colleague or what his client is doing, is that that's part of what they want to do. That's the only reason I can think of why, as Judge Callahan said, why the names. Well, his answer was to help monitor any future problems and to compare those names with names that are associated with other disasters. That is to see, overall, whether the government is learning from its mistakes or not, and that that is the interest that his client is pursuing. First of all, he's conceded that 18 of the 22 names were just cooperating witnesses, were bystanders, were people in the wrong place at the wrong time. So there's no need to... So what's their privacy interest? The people who discovered the bodies. In this media age in which we live, I can certainly imagine... But that's not all 22 of them. That's not all 22 people. It's 18. It's you were walking the perimeter. X was walking the perimeter of the file. In this media age in which we live in, I can imagine people going to their doorsteps of their house and hanging out and saying, what was it, putting a microphone in front of their face, what was it like to be there that day, what was it like? And this is precisely the kind of privacy interest and invasion of privacy that Judge O'Scillon mentioned that the Court, Supreme Court, has consistently recognized, not just in Favish. I would point out that for the last, I do this, so this is why I know this information, the last 25 years, the last quarter century, every case that has come before the Supreme Court on privacy, the Court has come down on the side of privacy. And Favish was the culmination of that, and they recognized that this kind of, they kept talking over and again about the kind of media scrutiny that would be involved and not just totally. And in all those cases, that's why I think this case clearly falls within settled precedent of the Supreme Court, cases we have cited, Favish, Wray, D.O.D. versus FLRA, which was a names case. And this Court, too. It's not just the Supreme Court imposing its will on the Ninth Circuit, although that did happen in Bibles. It happened once or twice? No, in the Bibles case, which I argued and Judge Reinhart asked me, well, what's the big deal about releasing these names? It was a list of names of people who were on a mailing list for the Department of Interior, and they just were interested in matters involving the Department of Interior, and a plaintiff wanted to contact them and give them their opposing views about what Interior was doing, and Judge Reinhart said, what's the big deal? And I tried to explain the Reporters Committee case, the balancing test, and it wouldn't releasing those particular names would not show anything about what the government was up to. Judge Reinhart respectfully disagreed. The Supreme Court summarily reversed in Bibles. So there is a consistent line, but as I was trying to say, it's not just the Supreme Court. This Court, in two cases, menace. I think menace is a very good case, because it's you don't have to have the kind of evidence that Mr. Barr is looking for of people being hurt or people being seriously injured. In menace, it was a list of people, names, just names, of people who were applying for rafting permits on a river here in Oregon, I believe, and this Court held that releasing those names. The Court made the very point that we're trying to make here in the menace case, that there is a public interest in the larger picture of how the government goes about distributing these permits. Just as here, there is a public interest in fire safety. The Court in menace said it will not be furthered, as Your Honor put it, marginally furthered, by releasing the particular names of the people who are applying, and those people might be subject to, it wasn't even harassment or stigma there, it was mailing solicitations that the Court was concerned about. So I think that this is in a, right in the middle of a solid line of Court precedent. Counsel, I understand from the record that an unredacted copy of this report was leaked. Is that your understanding? And it was seen by some people in any event. Is there, is any of that relevant to our deliberations? I don't think so. And I apologize. I don't know a lot about that. Maybe Plaintiff, Mr. Barr, knows more. I think a copy was leaked. I think to one individual. It was not widely disseminated. It was not widely spread. It did not become in the public domain. And I don't really think that Plaintiff hasn't pressed that point. So I don't think it's determinative here. I think what is determinative is the question the Court is asking of what further purpose would it serve to release these particular names. And Plaintiff, he's come up with a number of ideas, which are good ideas, but the problem with these ideas is that releasing this report and the names in this report  is not going to allow him to do that. If he wants to track the people, to see whether they were involved in earlier fires or later fires, well, putting those names in here by themselves is not going to allow him to do that. If he wants to ask the Forest Service what employees were involved in X fire and Y fire and Z fire, or how many employees were employed at the same fires, he can ask the Forest  There are no questions. Before your time is up, let me ask you about what seems to be a dramatic departure from past practice. I did ask about the difference between your approach here and that of OSHA. But as I understand it, in the past names were not redacted, even after the enactment of FOIA. It's just been the practice for many years to just send the report as is. And I know that doesn't mean that you can't change your view, but is there anything about that past practice that constituted an interpretation of the exemption or in any other way would be binding or influence the outcome here? Maybe when did they hire you? A long time ago. Longer than I care to admit. No, Your Honor, I don't believe that it's really relevant. It's true, though, right? It's true and it's noticeable, but agencies make changes in what they're going to redact. You know, almost on a daily basis. And I think they need to be free to do that. I would hate to see this Court hold that against them, because as we pointed out in our brief, what will end up happening is they're going to just become very conservative and just not release a lot of things because they'll be afraid later on that somebody will say, well, you released it in that case, you better release it here. And I don't think we want that kind of culture. I think this is the kind of case, tragic circumstances, but I think the system works, and I would ask the Court to look at page 42 of my brief when it has time, when it's reviewing this, and see everything that was pointed out from not only this report but other reports about what went wrong here. We know what went wrong. It's the Forest Service job to fix it. There's no conspiracy. There's no secrets here. And all we would be doing would be stigmatizing mostly bystanders. In a significant way, it's contrary to establish precedent by releasing these names. And I think Judge Hogan wrote a good opinion which should be affirmed. If there's no further time, I know the Court has had a long morning, and I'll cede my minute and 21 seconds. Thank you, counsel. Mr. Barr, you have some resources. I'm going to talk real quickly. I would address the last point first that, and it relates to what you said, Your Honor, or what you asked about the practice of disclosure. And it gets to the stigmatization. I call it the myth of stigmatization. For 50 years, the agency released these reports with the names in black and white. Well, we're all getting more and more sensitive about security issues and privacy issues. And we're all getting more and more sensitive about privacy issues because of the sort of increase of barrage. So why can't the agency change course? Agency is free to change course. It would be nice if it explained the rationale underlying that change, of course, Your Honors. There's conclusive research. Is there a legal requirement of that? There's no legal requirement. But as far as the burden that FOIA puts on the agency to sustain its action, it inverts the burden that would be in normal civil litigation and puts it all on the shoulders of Mr. Frank's client. And the agency has just said, well, there might be stigma attached to the release of these names, and therefore, we're not going to release them. I've already noted that there, I believe, there would be, at least for the 18 cooperating witness, an exoneration or an exculpatory purpose that would be served there. Also, it's worth noting that in this context, they're really arguing the inverse of the derivative use that they're damning us with. They're saying, well, you're not going to derive any benefit from the release of the names within the four corners of the document. Look at all these other affirmative steps you have to take to get some public benefit as a result. But, and that's called the derivative use. And it's an unsettled area in FOIA law right now, as is the converse, derivative harm. They're saying, well, it's not the disclosure of the report names that so much would be problematic. It's what other people might do if they get access to these names. Now, what's good for the goose is good for the gander, with all due respect. They can't say it's derivative use or derivative benefit in our context and then  I'd also like to point out in response to one of the very first questions you asked about OSHA's release of the report, it was released as part of its normal public process, but it was also released as well as a lot of other OSHA-related documents related to this investigation pursuant to a FOIA request. And if you, it's in the excerpts of record at page 207 and 208. Ryan Allen, who was the brother of one of the decedents, in his efforts to investigate, filed a FOIA request with OSHA. And they released not only the report, but a large amount of other information. And through that access to that information, he derived a list of 17 names that he lists at page 208 and 209 of the excerpts of record that have matched the names of individuals  Another point I want to make as far as the low-level, the argument that these are merely low-level people. OSHA identified, well, it's a unique part of firefighting, Forest Service firefighting, that people at what would normally be considered very low levels of the agency's hierarchy have extreme discretion and responsibility for literally life-and-death decisions. And OSHA, at excerpts of record 139, made note of this and said, I did not intend to point blame at the incident commander, as with most safety problems, it is with the lowest level of supervision where, quote, the rubber meets the road. In this context, knowledge of people, the normal weight that would be given by courts as far as the continuum of low-level to high-level of responsibility, is really inapplicable in this situation. Or at least if it's applied, it should be applied with that kind of awareness, that firefighting in the Forest Service context is very unique and not typical. And I've run out of time. I would like to just close that the body bags point, the point about the redaction of the name of the body bags individual, really attaches to information that happened after the fire. And it would have, there might be a valid argument as far as withholding those names, because when you're doing the balancing about what led up to this tragedy, who went on the site and who put these people in the body bags and carried them down the mountain. But the issue you raise is with respect to all 22 names. You're not suggesting that there are gradations that you might. You're correct. But I wanted to make clear that I'm not doctrinaire about this argument. And I do recognize that in every situation. The balancing could be different with respect to the aftermath versus what led up to it. The balancing test could be different. There's certainly an argument. Because this report contains such a minute component of the aftermath, we really haven't spent any energy addressing it. But since it was brought up in an oral argument, I wanted to make that point. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision.
judges: O'scannlain, Graber, Callahan